UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-12071-RWZ

VIKI CARRIERI

v.

LIBERTY LIFE INSURANCE COMPANY, et al.

ORDER

February 28, 2012

ZOBEL, D.J.

Plaintiff, fiancé of the late Joseph William Tafaro (herein, "insured,""decedent" or "Tafaro") and named beneficiary of an insurance police issued by Liberty Life Insurance Co. ("Liberty"), seeks to recover the policy proceeds. Kathryn Tafaro Platt, insured's ex-wife, their son Joseph William Tafaro, III, and daughter Mary Rebecca Tafaro (collectively, the "Tafaro Defendants") also claim the proceeds, by virtue of a 1999 divorce agreement that required the insured to maintain a life insurance policy for the children's benefit. Given the competing claims, Liberty declined to pay the proceeds to either claimant absent a court order. Plaintiff then brought suit against Liberty which in turn filed a motion for interpleader naming all claimants and deposited the life insurance proceeds into court. It was subsequently dismissed from the case.

In denying cross-motions for summary judgment because of factual disputes, I identified the decisive issue, namely, whether plaintiff was a bona fide purchaser of the policy proceeds. A bench trial commenced on December 12, 2011, and on that day the Tafaro Defendants moved for sanctions alleging plaintiff made prejudicial and material

misrepresentations throughout the course of the litigation. Below I address plaintiff's bona fide purchaser status, and the Tafaro Defendants' motion for sanctions.

## I. Carrieri's Bona Fide Purchaser Status

At trial Viki Carrieri was the sole witness on her behalf, defendants called Kathryn Tafaro Platt and Mary Rebecca Tafaro.

### a. Findings of Fact

Mary Kathryn Tafaro and the decedent were married on May 5, 1984. They had two children, Mary Rebecca and Joseph William, now aged 24 and 23 respectively. They subsequently divorced, and on July 14, 1999 executed a "Property Settlement and Support Agreement" ("SA") (Trial Ex. # 2). The agreement provided that:

> Husband shall maintain in full force and effect a life insurance policy on his life in the minimum amount of $500,000 designating that the proceeds shall be paid to the educational trust established for the benefit of the children.

It is undisputed that the decedent did not fully meet the life insurance obligation under the SA.

Plaintiff met Tafaro in 2000. They began dating in 2005 and became engaged in 2007. In September of 2006 plaintiff refinanced the mortgage on her home for an additional sum of $180,000 which netted $162,989 after costs and fees (Trial Ex. # 18). This money was to be used to fix up the home where both would live after their marriage and at Tafaro's request, to fund a loan to him for business and personal expenses. From the refinancing proceeds plaintiff gave Tafaro two checks: one in the amount of $21,495 on September 26, 2006, and one for $60,000 on October 3, 2006 (totaling $81,495) (Trial Exs. ## 4 and 5). At the time plaintiff lent these monies to Tafaro, she was unaware of his

2

support obligations under the SA.

On October 2, 2006, Tafaro executed a "Promissory Installment Note" pursuant to which he agreed to make monthly payments of "$1,678.11" for a term of "360 (months)" into a Bank of America account for the benefit of plaintiff "until the total principal of $81,495" is paid in full (Trial Ex. # 6). The monthly amount payable under the note was equal to one-half of the monthly amount due for principal and interest after the mortgage refinancing. Tafaro regularly paid this amount during his lifetime, and several payments were made after his death.

On May 23, 2007, eight months after the promissory note was executed, Tafaro purchased a 15-year life insurance policy with Liberty Life Insurance Company ("Liberty") that provided a death benefit in the amount of $150,000 (Trial Ex. # 1). The policy names "Viki Carrieri" as the beneficiary.

On March 28, 2007, plaintiff lent Tafaro an additional $25,000. From August 2007 through September 2009, plaintiff received 20 personal checks from Tafaro for certain expenses totaling $49,645.71 (Trial Exs. ## 22 - 41). The checks were largely for expenses unrelated to the note, yet, three checks were marked for the Bank of America account (Trial Ex. ## 23,25,32). While the memo line descriptions on the other checks vary, plaintiff testified that one group of checks were for payments on a joint American Express credit card she shared with Tafaro, another group were made out to "cash" and provided directly to Tafaro because he sought to avoid ATM fees when visiting plaintiff, and others were clearly labeled as expenses for personal items (e.g. "coach wallet," "Buffet tickets"). In all, the parties acknowledge that $72,158 (or 43 payments) was paid by Tafaro

toward the note. Docket # 56 at 8.  The parties also agree that the $25,000 March 2007 loan was completely repaid by Tafaro.

Tafaro, who suffered from pancreatic cancer, died on July 4, 2009.  After Tafaro's death, plaintiff, as the named beneficiary, applied to Liberty for the life insurance policy proceeds (Trial Ex. # 9).  The Tafaro Defendants also claimed the proceeds (Trial Ex. # 10).

### b. Conclusions of Law

As previously noted in my order denying cross-motions for summary judgment, I ruled that under controlling New Jersey law "[A] provision in a divorce decree requiring a parent to maintain a child as a beneficiary of a life insurance policy creates an equitable assignment when the parent, instead, designates a third party as the beneficiary." Carrieri v. Liberty Life Ins. Co., No. 09-12071-RWZ, 2011 WL 3794893, at *2 (D. Mass. 2011 Aug. 26, 2011) (internal citations omitted).  However, "[a] most important rule which limits the power of a beneficiary or other holder of an equitable interest," such as the Tafaro children, "to pursue and claim [the contested] property is the doctrine ... [that] a bona fide purchaser for value cuts off all equities in the same property."  Newman, G. Bogert & G. Bogert, Law of Trusts and Trustees § 962, p. 68 (3d ed. 2010) (hereinafter "Bogert"). Therefore, I decided that if plaintiff could show that she was a bona fide purchaser she would be entitled to the proceeds of the policy. Carrieri, 2011 WL 3794893, at *2. To do so, she must establish that: (1) she gave adequate consideration, (2) without notice of the Tafaro's existing life insurance obligation to his children, (3) for the right to be named beneficiary of the policy. Id. Plaintiff bears the burden of proof on these elements.  See

Krueger v. United States, 246 U.S. 69, 78-79 (1918); Wright-Blodgett Co. v. United States, 236 U.S. 397, 403 (1915).

### 1. Paid Value

"It is well settled that in order to have the benefit of the bona fide purchaser rule, the taker of the legal title must have 'paid value,' or must have been a taker 'for valuable consideration.'" Bogert § 887.  "[I]f the consideration paid is more than nominal, its inadequacy does not prevent the taker from being a purchaser. " Id.  A purchaser may qualify under the bona fide purchaser rule even though he does not pay the full market value for the property, if the consideration paid is reasonably adequate. See id., citing Alexander v. Andrews, 135 W.Va. 403, 413-414 (1951); see also Swanson v. Swanson, 796 N.W.2d 614, 633 (N.D. 2011).

Plaintiff testified that she gave Tafaro an $81,495 loan in exchange for both a promissory note to repay the loan and a life insurance policy to secure the note.  The parties do not dispute that plaintiff gave Tafaro a loan in this amount.  If this was the nature of the deal, I need not weigh the separate contributions of the promissory note and the life insurance policy to the value of the overall deal; the $81,495 loan is sufficient "value" for the life insurance policy to establish bona fide purchaser status.

### 2. No Notice of Existing Equitable Interest

Plaintiff testified that she had no knowledge of Tafaro's obligation to maintain life insurance for his children under the SA at the time she made the loan. Defendants offered no evidence to rebut this testimony; therefore, it stands.

### 3. For Right to be Named Beneficiary

At trial, plaintiff testified that the life insurance policy was a crucial component to the deal she made with Tafaro and that she would not have made the loan without being named beneficiary on a life insurance policy sufficient to secure the monies she lent. On this element the facts do not support her contention.

First, Tafaro did not secure the policy until eight months after the promissory note was executed. Had the policy been a necessary component of the deal, a prudent lender would have waited until the policy was issued before advancing the monies.

Second, no writing was executed contemporaneously with the loan (or at all, for that matter) indicating, in any way, that Tafaro was obligated to maintain a life insurance policy as a condition of the loan.

Thus, the record supports a finding that the life insurance policy was separate from the loan and therefore, plaintiff has not met her burden of establishing entitlement to the full proceeds of the policy as a bona fide purchaser.

### 4. Equitable Relief Available

However, this does not necessarily end the inquiry. If a court "determines that [plaintiff] is not a bona fide purchaser, or that she is a bona fide purchaser of less than the total amount of the insurance proceeds a court may ... take into account other factors brought to its attention by the parties relating to the equity of the distribution. It may then make an apportionment of the proceeds granting or denying a constructive trust as to all or a part of the property.... [I]t is appropriate to consider the equitable principles favoring [all parties]." Pluemer v. Pluemer, 776 N.W.2d 261, 268 - 69 (Wis. Ct. App. 2009).

New Jersey law is in accord; in Flanigan v. Munson, 175 N.J. 597, 611 (2003) the New Jersey Supreme Court cautioned that, when redistributing the proceeds from a named beneficiary of a life insurance policy to a beneficiary of a settlement agreement, such an equitable remedy "is a powerful tool to be used only when the equities of a given case clearly warrant it." Id. at 611.  The court noted that it is primarily "designed to prevent unjust enrichment of something that in equity and good conscience does not belong to the defendant." Id. at 608.

Here, because the Tafaro Defendants' motion for sanctions affects my ultimate consideration of the equities, I turn to it next.

## II. Tafaro Defendants' Motion for Sanctions

### a. Plaintiff's Original "Lump Sum" Theory of the Loan and the Discovery of Bank Records Documenting Tafaro's Payments on the Loan

From the outset of this litigation, plaintiff led opposing counsel and the court to believe that the first two "installments of the loan" to Tafaro, which totalled $81,495, remained almost entirely outstanding because Tafaro had only "repaid a very small portion of the principal amount he borrowed."

One week before trial, counsel for the Tafaro Defendants notified plaintiff that he had recently discovered that "[p]laintiff received (41) monthly payments from the Deceased pursuant to the terms of the Note (in addition to $49,092.80 of [sic] other payments)" in Tafaro's bank records exchanged during discovery.[1]  Docket # 53 at 2.

The Tafaro Defendants moved for sanctions pursuant to Fed.R.Civ.P. Rule 11 and

---

[1] As previously noted, the plaintiff later conceded this amount was $72,158.73 made in 43 payments. Docket # 56 at 8.

28 U.S.C. § 1927, arguing that plaintiff's misrepresentations have "forced [them] to litigate nearly this entire matter based upon material false statements of fact." Docket # 53 at 5. As relief the Tafaro Defendants request that the court strike any evidence or argument not advanced by plaintiff prior to trial and that they be awarded attorney's fees.

### b. Plaintiff's New "Shared Refinancing" Theory of the Loan

Plaintiff contends that Tafaro actually agreed in the promissory note to make half of the monthly payments due under the refinanced mortgage for its entire 30-year duration and not just until the borrowed sum of $81,495 was repaid. Docket # 56 at 7-8.

She concedes that Tafaro made payments in accord with the promissory note totaling $72,158.73, id. at 8, but states that "as of April 2010 the payments stopped, the outstanding principal balance on [her] mortgage loan was $396,000.00." Thus, she claims that while Tafaro made 43 payments, these payments actually "went primarily to the interest portion of the mortgage loan" leaving "[a]pproximately $152,000.00 of the increased principal from [her] refinancing [ ] outstanding." Id. at 6. Even though Tafaro only borrowed $81,495, plaintiff calculates the total amount he owed over the life of the loan as $180,640, with a remaining balance of $111,837 (Trial Ex. # 44).

### c. Tafaro Defendants' Arguments for Sanctions

The Tafaro Defendants assert that statements made by plaintiff and advanced by her counsel were clearly not "well-grounded" in fact, nor based on a "reasonable inquiry" as required by Rule 11; that plaintiff acted "vexatiously" and with an "improper purpose," Docket # 53 at 7-8; and that they have been prejudiced as a result of these misrepresentations. They note that plaintiff's "new theory raises issues concerning parol

8

evidence and the statute of frauds that have not been briefed or considered." Docket # 57 at 11 n.8.

### d. Plaintiff's Response

Plaintiff admits that she "did not explain [ ] that the monies paid by Tafaro to Carrieri's mortgage lender went primarily toward payment of the interest on her mortgage loan." Docket # 56 at 6. She further acknowledges that "both sides engaged in an effort to reduce legal fees and did not closely scrutinize the bank records until shortly before trial," that as a result "[her] own counsel did not fully appreciate the interrelationship between the promissory note and mortgage loan until preparing for trial," and that the "relationship should have been made clearer." Id. at 12 - 13. However, she contends that the alleged misstatements identified by defendants are merely incomplete, but true, statements. Plaintiff also notes that defendants had the bank records for over a year and a half before trial and were free to carefully review them at any time, and that defendants chose not to depose plaintiff or serve interrogatories which undoubtably would have further clarified the facts (Docket # 56 at 12 - 13).

### e. Standard

Fed.R.Civ.P. Rule 11 (b)(3) and Fed.R.Civ.P. Rule 11 (c)(1) provide, respectively, that:

> By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.
> ...

9

>If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation.

"Rule 11(b) is not a strict liability provision, and a showing of at least culpable carelessness is required before a violation of the Rule can be found." Citibank Global Markets, Inc. v. Rodriguez Santana, 573 F.3d 17, 32 (1st Cir. 2009).  However, Rule 11 "does not mandate a finding of bad faith." Chambers v. NASCO, Inc., 501 U.S. 32, 46 - 47 (1991).

"The imposition of sanctions for a Rule 11(b) violation is a matter of discretion, requiring the court to marshal the pertinent facts and apply the fact-dependent legal standard that informs its determination as to whether sanctions are warranted." On Time Aviation, Inc. v. Bombardier Capital Inc., 570 F.Supp.2d 328, 330 (D. Conn. 2008). "Selection of the type of sanction to be imposed lies with the district court's sound discretion." Riccard v. Prudential Ins. Co., 307 F.3d 1277 (11th Cir. 2002).  It is well established that the "purpose of Rule 11 sanctions is to deter rather than to compensate." Lamboy-Ortiz v. Ortiz-Velez, 630 F.3d 228, 247 (1st Cir. 2010) (internal citations omitted).

While Rule 11 does not require a finding of bad faith, 28 U.S.C. §1927 does. 28 U.S.C. § 1927 provides:

>Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

"Unreasonable[ ] and vexatious[ ]" is a high legal standard and "a party may be penalized under § 1927 only when it displays a serious and studied disregard for the

orderly process of justice." United States v. Nesglo, Inc., 744 F.2d 887, 891 (1st Cir. 1984) (internal citations omitted).

### f. Analysis

Until the day of trial plaintiff did not explain that the promissory note was directly related to the refinancing of her mortgage. Moreover, it came to light, on the eve of trial, that Tafaro paid $72,158.73 on that note. Even if these payments represented largely interest on the refinanced mortgage, as the new theory asserts, since each was one-half the amount due under the mortgage they unquestionably also included principal. They thus subsidized plaintiff's original mortgage (and interest thereto). Moreover, plaintiff retained the entire equity interest in the home. This arrangement describes a very different set of circumstances than the one initially described, a loan of $81,495 that allegedly remained fully outstanding. Importantly, these new facts bear on core legal issues in the case, including to what extent recovery by plaintiff of the life insurance could be considered unjust enrichment in light of these repayments.

Although plaintiff made equivocal statements that now may be said to "fit" with her new loan theory, several of her prior representations contradict the new theory.

For instance her statement of undisputed facts accompanying her summary judgment motion states:

> Joseph borrowed a total of $106,495.00 from plaintiff in three installments .... As of the time of his death, Joseph had repaid the third installment of the amount he borrowed from Carrieri; $25,000.00, leaving a principal balance of approximately $81,495.

Docket # 28 at 3, citing Carrieri Affidavit Ex. B.

Plaintiff here (as she did from inception of this suit) treats the monies provided to

Tafaro as a three-part $106,495 loan of which $25,000 has been repaid and $81,495 remains. This explanation of the loan does not acknowledge the $72,158.73 in payments made by Tafaro under the note. Even under plaintiff's new theory, that Tafaro's payments were primarily interest on the mortgage balance, a portion of the payments are still attributable to the loan's principal balance. Therefore, stating that the remaining balance on the loan is $81,495 is a misstatement of fact, and not mentioning these payments in her pleadings is misleading.

Further, plaintiff represented:

> Joseph promised Carrieri that he would repay her, that he would give her a promissory note for the money he borrowed, and that he would obtain a life insurance policy which named [her] as beneficiary, <u>in an amount sufficient to cover the monies loaned plus any interest</u> she incurred due to her refinancing her home to obtain the funds.

Docket # 28 at 2 -3, citing Carrieri Affidavit Ex. B thereto.

Although this statement does mention interest on the mortgage, it is not adequate to put the Tafaro Defendants on notice of the new theory. As revised, plaintiff now claims Tafaro actually owed $180,639.85 on the note (Trial Ex. # 44). Clearly, if this were the case, the $150,000 life insurance policy would not have been sufficient to fully secure the monies loaned with interest.

In any event, it is not necessary to parse each phrase or allegation made by plaintiff under both theories. Suffice it to say, the overall theory advanced by plaintiff from inception to trial was that she lent $106,495 to Tafaro of which $25,000 was paid back and $81,495 remained outstanding. Therefore, not mentioning in the pleadings the $72,158.73 Tafaro did pay was, at best, highly misleading, and, at worst, false.

**g. Sanctions Resolution**

I credit plaintiff's counsel's representation that he was trying to save costs and find significant the fact that plaintiff timely provided to the Tafaro Defendants the bank records. I also credit plaintiff's counsel's representation that he did not appreciate the interrelationship between the promissory note and the mortgage refinancing. Therefore, I find that counsel did not act vexatiously. I am satisfied that his missteps are a result of carelessness, not deceitfulness. Therefore, 28 U.S.C. § 1927 sanctions are not appropriate.

Nevertheless, attorneys have a duty to listen to and communicate regularly with their clients and to reasonably investigate the factual basis for the assertions and arguments they advance, and the parties have an obligation to brief counsel honestly and completely. Counsel's and plaintiff's conduct here was culpably careless. The Tafaro Defendants have been prejudiced by only learning the facts and arguments supporting plaintiff's new theory of the loan shortly before trial, and were mislead, albeit unintentionally, by factually inaccurate and/or misleading representations. Therefore, it would not be just or appropriate to allow plaintiff to proceed on the new theory of the loan. Cf. Johnston v. Holiday Inns, Inc., 595 F.2d 890, 896 (1st Cir. 1979) (once litigation is sufficiently underway, plaintiffs are "not entitled to start a new game with new rules."); Thibeault v. Square D Co., 960 F.2d 239, 247 (1st Cir. 1992) ("[I]t is beyond dispute that an eleventh-hour change in a party's theory of the case can be [ ] harmful ... [such conduct would cause defendant] to rush its final trial preparations ... we do not think it is either reasonable or fair to expect a litigant to bear so onerous a burden").

The appropriate sanction here is to restrict plaintiff to her original theory. Therefore, I grant defendants' motion to the extent it requests that I strike the evidence and arguments inconsistent with or in addition to plaintiff's initial theory and will confine my considerations of the equities to the original "lump-sum" theory of the loan.[2]

### III. Balancing the Equities

Here, it is undisputed that plaintiff lent Tafaro $81,495, and that he repaid $72,158.73. I find as a matter of equity, that plaintiff, as the named beneficiary of the life insurance policy, is harmed by Tafaro's non-payment and entitled to receive the outstanding balance of the loan, which is $9,336.27.

### IV. Conclusion

The Tafaro Defendants' motion for sanctions (Docket # 52) is ALLOWED, in part, consistent with the above. Plaintiff shall recover $9,336.27 of the policy proceeds, the Tafaro defendants, the remainder, $140.663.73.[3]

Judgment may be entered accordingly.

|  |  |
|---|---|
| February 28, 2012 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL<br>UNITED STATES DISTRICT JUDGE |

---

[2]  Although I limit my consideration of plaintiff's harm to plaintiff's original theory , it bears noting that the alleged harm of "$111,837.49" under her new theory, even putting aside potential parol evidence issues, is flawed.  The present value of the interest on the mortgage otherwise payable over 30 years is undoubtedly substantially less than the amount claimed.

[3]  Plaintiff adequately established at trial that the checks provided to her from August 2007 to September 2009 that were not marked, in whole or in part, for the Bank of America account were for other expenses unrelated to the loan or note.